Rahul Malhotra
2148 Harkins Ave
Menlo Park, CA 94025
(650) 388-9095 (Phone and Fax)
e-mail: R.Rimmy.Malhotra+Courts@gmail.com

Pro Se Plaintiff

UNITED STATES DISTRICT COURT

NORTHEN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Rahul Malhotra | Case No.: **CV 13 3768** |
| Plaintiff, | COMPLAINT |
| vs. | |
| Rev Worldwide Inc., | **DMR** |
| Defendant | |

DEMAND FOR JURY TRIAL

COMPLAINT

## I.   JURISDICTION

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). Specifically, Plaintiff alleges violations of laws under the Securities Act of 1933 "Act" 15 USC § 77a et seq. Additionally, Jurisdiction is proper under U.S.C. § 1332

## II.   VENUE

2. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the acts, practices, and courses of business constituting the alleged violations occurred within the Northern District of California.

## III.  INTRADISTRICT ASSIGNMENT

3. San Francisco or Oakland is proper Division assignment since the alleged acts happened within the county of San Mateo.

## IV.  PARTIES

4. Plaintiff, Rahul Malhotra, is an individual, who resides within the District. Plaintiff lists his principal address within the District.

5. Defendant, Rev Worldwide Inc., is a Delaware Corporation, with its principal place of business in Austin, Texas.

## V.  STATEMENTS OF FACTS

6.      On belief and Information, Rev Worldwide ("Rev") is a privately held Delaware corporation controlled by various directors, shareholders and officers.

7.      On belief and Information, Director A, Director B and Directors C were and are all current directors and/or officers of Rev.

8.      GoalMine Inc. "GoalMine" at the time of the alleged violation was a Delaware Corporation with its principal place of business in San Francisco, California.

9.      Plaintiff at the time of the allegation was a minority shareholder of GoalMine.

10.      On information and belief Directors A, Director B and Directors C, were both controlling directors and controlling shareholders of both Rev and Goalmine directly and indirectly through various investment vehicles.

11.      On information and belief, on or about August 2012, the boards of both companies voted and approved to

consummate a merger/acquisition "Merger" of Goalmine, by and between a subsidiary of Rev, and formed, "GoalMine Merger Sub", to facilitate such merger. Goalmine Merger Sub, a Delaware corporation, was and is a wholly owned entity of Rev created for the sole purpose to effectuate the Merger.

12.     On or about August 23rd, 2012 the Defendant used the mails or facilities of interstate commerce in connection with the offer and sale of common stock in Rev. Specifically, Defendant mailed, or caused to be mailed, offering documents in conjunction with aforementioned Merger by and between Rev, GoalMine, and GoalMine Merger Sub. [See Exhibit A]

13.     Pursuant to the merger agreement, after a required shareholder vote and consummation of the merger, shareholders of GoalMine would be issued, without further action, common stock shares of Rev Worldwide as consideration, in exchange for their GoalMine shares. GoalMine shares would cease to exist after the merger was completed. [See Exhibit A, page 8 Section 2.7]

14.     On August 30, 2012, Rev consummated the Merger with board approval and filed a certificate of merger with the State of Delaware to legally effectuate and record the

Merger. In the process, as described in paragraph 13, issued Rev common stock shares to all GoalMine shareholders. Such Rev common stock was and are considered 'securities' as defined by the Act.

15.     On information and belief, Merger received less than unanimous consent of GoalMine shareholders as prescribed by the merger agreement, but greater than a majority.

16.     On information and belief, a registration statement covering the Rev common stock issued in this transaction was not effective with any state or federal regulators (California Department of Corporation or Securities and Exchange Commission) at the time of the offering or sale (August 23, 2012, or August 30, 2012).

17.     Sometime in October 2012 after the merger, Defendant delivered copies of Rev stock certificates to GoalMine shareholders through the interstate mails to confirm their purchase of Rev common stock.

18.     On information and belief, more than one of the purchasers of the common stock was not "accredited" or not "sophisticated", or lacked a "purchaser representative" at the time of the offer and sale by Rev, as defined and

prescribed by the Act. (Title 17 § 230.215), Rule 501(h) of the Act.

19.     On information and belief, during the summer of 2012 while GoalMine was contemplating the merger with and by Rev, Rev originally requested that plaintiff act as a "purchaser's representative" for all shareholders in the transaction so they could potentially qualify for an exemption from registration under the Act pursuant to Section 4(2) of the Act. When plaintiff refused, the merger agreement was modified to delete any requirement of a purchaser's representative. Defendant at the time acknowledged that they knew many of the prospective purchasers in the offering were neither "sophisticated" nor "accredited" as defined by the Act.

20.     Omitted.

21.     Prior to the offering, GoalMine urged that the condition for a unanimous vote by all shareholders be made a non-waivable condition to closing the Merger, but Rev refused and such change was never made.

22.     On information and belief, Rev failed to provide any disclosure documentation or offering memorandum prior to the sale detailing the basic financial condition, ownership or other material information relevant to making

an informed investment decision as would be prescribed by the Act or other relevant state statue.

23.     Rev began the securities offering and closed the Merger in approximately seven days, denying prospective purchasers reasonable opportunity to make inquiries regarding Rev's finances and operations, receive any disclosure, or make any basic inquiries about the offering or Rev's state of affairs.

24.     On information and belief, more than one purchaser requested, including the Plaintiff, financial disclosures related to business and financial operations of Rev and was refused. Specifically on August 27, 2012 after receiving the merger documents the Ashner Family Limited Partnership, a GoalMine shareholder, made a written request to Rev for disclosure in conjunction with the transaction, and additionally requested that such information be furnished to all shareholders. Plaintiff asserts that GoalMine shareholders were denied access to any disclosure in conjunction with the offering.

25.     On information and belief the Ashner request was ignored and none of the requested information was ever furnished to any shareholders.

26.      By virtue of their Directorships at Rev, Directors A, B and C all were in possession to all material information regarding the financial condition, detailed business operations of Rev, future prospects of Rev and important risks which they failed or refused to furnish to the remaining minority shareholders of Goalmine.

27.      On numerous occasions after the Merger was completed various GoalMine shareholders requested Defendant to establish why Defendant believed Defendant was exempt from registering securities issued in connection with the Merger under Section 5 of the Act and as prescribed by Title 17 § 230.145, and Defendant failed to respond.

28.      On numerous occasions, former GoalMine shareholders, now Rev shareholders, requested the identities and contact information of Rev directors and were refused.

29.      Plaintiff asserts Rev's affirmative failure to provide any disclosure, including, but not limited to, basic financial statements, list of major shareholders, or background of directors, business risks, historical litigation, patents, current litigation, proposed industry regulations, related party transactions or other information that would be required by "Schedule A" or "Form

S-4" as promulgated under the Act, constitutes an omission of material information that a prudent man would need to make an informed decision. Such facts and information constitute the basic foundation to securities valuation and were starkly absent in the Rev stock offering.

30.     Plaintiff alleges that Defendant failed to disclose that management, and senior employees had extended material related party loans to the company. Such facts were material given that Rev was in financial duress at the time of this offering and was unable to pay vendors or employees.

31.     Plaintiff failed to disclose the details of discussions regarding impending acquisitions, past financing and imminent financing that would have an impact on the value of Rev common shares. Similarly, Plaintiff failed to disclose the size and terms of any previous securities offerings. Such facts were relevant because such offerings were potentially dilutive to the value of the consideration received in the transaction.

32.     Plaintiff failed to disclose a copy or any information regarding any valuation of Rev shares that it had in its possession. Such facts were relevant as it would have provided some basis of a third party appraisal of

shares, even though such appraisals may not have taken into account Rev's then financial situation.

33.     Plaintiff, on information and belief, asserts that there were no timely audited or certified financial statements available for the Defendant. Such facts are relevant because these items are required to obtain and exemption from registration under the Act, and are needed to reliably value Rev common stock.

34.     Defendant knew, or should have known, that the above facts were material and should have disclosed such facts.

## VI. CLAIMS

35.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1 through 34 above as if set forth fully herein.

36.     **Claim I** - By engaging in the conduct described above, Defendant directly or indirectly, by (a) use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (b) offered, sold, and issued securities (c) without an effective registration statement in violation of Section 5 and Section 12(a)(1) of Act and other sections of the Act.

Plaintiff further believes that Defendant's unregistered public offering did not qualify for any exemption from registration under the Act.

37.     **Claim II**- By engaging in the conduct described in paragraph 21 through 34, Defendant directly or indirectly violated CALIFORNIA CORP CODE § 25401, and other sections of the CALIFORNIA CORP CODE.

38.     **Claim III**- By engaging in the conduct described above, Defendant violated CALIFORNIA CORP CODE § 25110.


## VII. **PRAYOR FOR RELIEF**

39. Whereas the Plaintiff requests the Court,

(A) Order Defendant to rescind Rev common stock offering, for the full consideration given (or equivalent value) plus interest, issued in violation of Section 5 pursuant to Section 12(a)(1) of the Act;

(B) Order Defendant to rescind common stock offering, for cash (or equivalent actions), of the full consideration given (or equivalent value) plus interest, issued in violation of CALIFORNIA CORP CODE § 25401 and § 25110;

(C) Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

(D) Award such other and further relief as the Court deems just and proper

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

40. Plaintiff requests a jury trial on all Claims.

Respectfully Submitted,

Rahul Malhotra

August 14, 2013

# EXHIBIT A



August 21, 2012

_Via First Class Mail/Electronic Mail_

      RE:    Notice of Merger Transaction

Dear Stockholders of Goalmine, Inc.,

On behalf of Goalmine, Inc. ("**_Goalmine_**"), I am pleased to submit to you this letter and notice to inform you that Goalmine is a constituent corporation in a merger which will be effective in the State of Delaware as soon as practicable after the date of this Letter (the "**_Merger_**").

In connection with the Merger, enclosed with this letter, please find the following documents:

    (a) The Merger Agreement, to be entered into by and among Goalmine, Rêv Worldwide, Inc., a Delaware corporation and an affiliate of Goalmine, and Goalmine Merger Sub, Inc., a Delaware corporation;

    (b) Unanimous Written Consent in Lieu of Meeting of the Stockholders of Goalmine;

    (c) Conversion Notice; and

    (d) Notice of Appraisal Rights.

PLEASE REVIEW THESE DOCUMENTS CAREFULLY AND SIGN AND DELIVER YOUR SIGNATURE PAGES TO THE STOCKHOLDERS' RESOLUTIONS AND CONVERSION NOTICE AS SOON AS POSSIBLE TO JESSE WEISS BY FAX (512-532-0926) OR EMAIL (JESSE.WEISS@REVWORLDWIDE.COM) AND SEND THE ORIGINAL, SIGNED DOCUMENTS TO:

Goalmine, Inc.
c/o Rêv Worldwide, Inc.
Attention: Jesse Weiss
601 North Lamar Blvd., Suite 300
Austin, Texas 78703

_[Signature page follows.]_

© GoalMine, 2012

1

# goalmine™

I am very excited about the potential value of the Merger and believe that it will yield significant growth opportunities for all those involved. Please contact me (512.366.3640) or Jesse Weiss (512. 485.2553) should you have any questions about the foregoing or enclosed documents.

Sincerely,

_____
Roy Sosa
Chairman of the Board, Goalmine, Inc.

cc: Jesse Weiss (via email)
Rimmy Malhotra (via email)

Enclosures: Merger Agreement
Stockholders' Unanimous Written Consent
Conversion Notice
Notice of Appraisal Rights

## MERGER AGREEMENT

This Merger Agreement (this "*Agreement*"), dated as of August 30, 2012, is by and among (i) Rêv Worldwide, Inc., a Delaware corporation ("*Parent*"), (ii) Goalmine Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent ("*Merger Sub*" and, together with Parent, the "*Parent Parties*"), and (iii) Goalmine, Inc., a Delaware corporation (the "*Company*" and, together with the Parent Parties, the "*Parties*").

### RECITALS:

A.     Each of the Boards of Directors of the Company and the Parent Parties believes it is in its and its stockholders' best interests that Parent acquire the Company through the statutory merger of Merger Sub with and into the Company (the "*Merger*") and, in furtherance thereof, have approved the Merger.

B.     Upon the election of the Company's stockholders, all of the Company's issued and outstanding shares of Series A1 Preferred Stock, Series A2 Preferred Stock, Series A3 Preferred Stock, and Series B Preferred Stock, each having a par value of $0.001 per share, will be converted into validly issued, fully paid, and nonassessable shares of the Company's common stock, par value $0.001 per share (the "*Company Shares*"), at the Closing (as defined below) and pursuant to the terms and conditions of the Company's Amended and Restated Certificate of Incorporation (the "*Preferred Stock Conversion*").

C.     At the Closing and after the Preferred Stock Conversion, the Company Shares shall be converted into the right to receive shares of Parent's common stock, par value $0.001 per share (the "*Parent Shares*") in the Merger.

D.     The Parties desire to make certain representations and warranties and other agreements in connection with the Merger.

E.     For federal income tax purposes, the Parties intend to adopt a plan of reorganization within the meaning of, and to cause the Merger to qualify as a reorganization under, Section 368(a) of the Internal Revenue Code of 1986 (the "*Code*").

### AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, each Party agrees as follows:

### ARTICLE I.
### DEFINITIONS

"*Action*" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding.

"*Affiliate*" or "*Affiliated*" with respect to any specified Person, means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such specified Person. For this definition, "control" (and its derivatives) means the possession, directly or indirectly, of 50% or more of the voting Equity Interests of a Person, or the power, directly or indirectly, to vote 50% or more of the voting Equity Interests of a Person.

"*Agreement*" is defined in the preamble to this Agreement.

"*Breach*" means (a) any breach, inaccuracy, failure to perform, failure to comply, conflict with, failure to notify, default, or violation, or (b) any other act, omission, event, occurrence or condition the existence of which would (i) permit any Person to accelerate any obligation or terminate, cancel, or modify any right or obligation, or (ii) require the payment of money or other consideration.

"*Closing*" is defined in Section 2.2.

"*Closing Date*" is defined in Section 2.2.

"*Code*" is defined in the recitals to this Agreement.

"*Commercially Reasonable Efforts*" means the efforts, time, and costs that a prudent Person desirous of achieving a result would use, expend, or incur in similar circumstances to ensure that such result is achieved as expeditiously as possible; *provided, however, that* no such use, expenditure, or incurrence will be required if it would have a Material Adverse Effect on such Person calculated immediately prior to the Closing Date.

"*Company*" is defined in the preamble to this Agreement.

"*Company Options*" is defined in Section 8.3.

"*Company Shares*" is defined in the recitals to this Agreement.

"*Company Stock Certificate*" is defined in Section 2.7(b).

"*Confidential Information*" means any confidential information concerning the businesses and affairs of the Parent Parties, the Company, or their respective Affiliates.

"*Consent*" means any consent, approval, notification, waiver, or other similar action that is necessary or convenient.

"*Contract*" means any contract, agreement, arrangement, commitment, letter of intent, memorandum of understanding, heads of agreement, promise, obligation, right, instrument, document, or other similar understanding, whether written or oral.

"*Conversion Consideration*" is defined in Section 2.7(b).

"*Corporate Law*" is defined in Section 2.1.

"***Damages***" means all damages (including incidental and consequential damages), losses (including any diminution in value), Liabilities, payments, amounts paid in settlement, obligations, fines, penalties, expenses, costs of burdens associated with performing injunctive relief, and other costs (including reasonable fees and expenses of attorneys, accountants and other professional advisors, and of expert witnesses and other costs (including the allocable portion of the relevant Person's internal costs) of investigation, preparation and litigation in connection with any Action or Threatened Action) of any kind or nature whatsoever, whether known or unknown, contingent or vested, or matured or unmatured.

"***Effective Time***" is defined in <u>Section 2.3</u>.

"***Encumbrance***" means any Order, Security Interest, Contract, easement, covenant, community property interest, equitable interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"***Enforceable***" – a Contract is "Enforceable" if it is the legal, valid, and binding obligation of the applicable Person enforceable against such Person in accordance with its terms, except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium, or other Laws relating to or affecting the rights of creditors, and general principles of equity.

"***Equity Interest***" means (a) with respect to a corporation, any and all shares of capital stock, (b) with respect to a partnership, limited liability company, trust, or similar Person, any and all units, interests or other partnership/limited liability company interests, and (c) any other direct equity ownership or participation in a Person.

"***Exchange Ratio***" means the ratio of the relative per share valuations of the Company Shares to the Parent Shares, or $0.17:$0.80. As a result, after the Effective Time, the Stockholders will receive 0.2125 Parent Shares for each Company Share.

"***Expiration Date***" means December 31, 2012.

"***Governmental Body***" means any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or other similar recognized organization or body exercising similar powers or authority.

"***Intellectual Property***" means any rights, licenses, liens, security interests, charges, encumbrances, equities, and other claims that any Person may have to claim ownership, authorship or invention, to use, to object to or prevent the modification of, to withdraw from circulation, or control the publication or distribution of any fictitious business names, trading names, corporate names, registered and unregistered trademarks, service marks, and applications; patents and patent applications; business methods, inventions, and discoveries that may be patentable; or copyrights in both published works and unpublished works.

"**Knowledge**" – an individual will be deemed to have "Knowledge" of a particular fact or other matter if (a) such individual is actually aware of such fact or other matter; (b) such individual should be aware of such fact or other matter; or (c) a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a comprehensive investigation concerning the existence of such fact or other matter.  A Person other than an individual will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving as a director, manager, officer, partner, member, executor, trustee, or similar position of such Person or a Subsidiary of such Person (or in each case any similar capacity), or any employee who is charged with responsibility for a particular area of the operations of such Person or its Subsidiaries (i.e., an employee in the environmental section with respect to knowledge of environmental matters) has, or at any time had, Knowledge of such fact or other matter.

"**Law**" means any law (statutory, common, or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation, executive order, or other similar authority enacted, adopted, promulgated, or applied by any Governmental Body, each as amended and now in effect.

"**Liability**" or "**Liable**" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, matured or unmatured, conditional or unconditional, latent or patent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**Material Adverse Change (or Effect)**" means a change (or effect) in the condition (financial or otherwise), properties, assets, Liabilities, rights, obligations, operations, business, or prospects which change (or effect), individually or in the aggregate, could reasonably be expected to be materially adverse to such condition, properties, assets, Liabilities, rights, obligations, operations, business, or prospects.

"**Merger**" is defined in the recitals to this Agreement.

"**Merger Certificate**" is defined in Section 2.3.

"**Merger Consideration**" is defined in Section 2.7(b).

"**Merger Sub**" is defined in the preamble to this Agreement.

"**Note**" means that certain unsecured promissory note issued by the Company in favor of MPOWER Ventures II, LP.

"**Note Assignment**" means the Assignment Agreement to be entered into by the Company, as assignor, Parent, as assignee, and MPOWER Ventures II, LP, assigning the Note, in substantially the form attached hereto as Exhibit D.

"**Order**" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Body, arbitrator, or mediator.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity, quality, and frequency).

"*Organizational Documents*" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"*Parent*" is defined in the preamble to this Agreement.

"*Parent Options*" is defined in Section 8.3.

"*Parent Parties*" is defined in the preamble to this Agreement.

"*Parent Shares*" is defined in the recitals to this Agreement.

"*Parties*" is defined in the preamble to this Agreement.

"*Permit*" means any permit, license, certificate, approval, consent, notice, waiver, franchise, registration, filing, accreditation, or other similar authorization required by any Law, Governmental Body, or Contract.

"*Person*" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization, or Governmental Body.

"*Preferred Stock Conversion*" is defined in the recitals to this Agreement.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Security Interest*" means any security interest, deed of trust, mortgage, pledge, lien, charge, claim, or other similar interest or right, except for (i) liens for taxes, assessments, governmental charges, or claims that are being contested in good faith by appropriate Actions promptly instituted and diligently conducted and only to the extent that a reserve or other appropriate provision, if any, has been made on the face of the financial statements in an amount equal to the Liability for which the lien is asserted, (ii) statutory liens of landlords and warehousemen's, carriers', mechanics', suppliers', materialmen's, repairmen's, or other like liens (including contractual landlords' liens) arising in the Ordinary Course of Business and with respect to amounts not yet delinquent and being contested in good faith by appropriate proceedings, only to the extent that a reserve or other appropriate provision, if any, has been made on the face of the financial statements in an amount equal to the Liability for which the lien is asserted, and (iii) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other similar types of social security.

"*Stockholders*" means the record holders of the shares of capital stock of the Company as they may be constituted from time-to-time.

"*Subsidiary*" means, with respect to any Person: (a) any corporation of which more than 50% of the total voting power of all classes of the Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors is owned by such Person directly or through one or more other Subsidiaries of such Person, and (b) any Person other than a corporation of which at least a majority of the Equity Interest (however designated) entitled (without regard to the occurrence of any contingency) to vote in the election of the governing body, partners, managers or others that will control the management of such entity is owned by such Person directly or through one or more other Subsidiaries of such Person.

"*Surviving Corporation*" is defined in Section 2.1.

"*Tax*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs, ad valorem, duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Termination Date*" means the earlier to occur of (a) the Expiration Date, and (b) the date on which this Agreement is terminated pursuant to Section 7.1.

"*Threatened*" means a demand or statement has been made (orally or in writing) or a notice has been given (orally or in writing).

"*Transaction Documents*" means this Agreement, the Merger Certificate, and the Note Assignment.

"*Transactions*" means all of the transactions contemplated by this Agreement, including: (a) the Merger, the filing of the Merger Certificate, and Parent's delivery of the Merger Consideration hereunder; (b) the execution, delivery, and performance of all of the documents, instruments and agreements to be executed, delivered, and performed in connection herewith, including each Transaction Document; and (c) the performance by the Parent Parties, the Company, and the Stockholders of their respective covenants and obligations (pre- and post-Closing) under this Agreement.

## ARTICLE II.
## THE MERGER

2.1    **The Merger**.  At the Effective Time, subject to this Agreement and Section 251 of the Delaware General Corporation Law (the "*Corporate Law*"), Merger Sub will be merged with and into the Company, Merger Sub's separate corporate existence will cease, and the Company will continue as the surviving corporation and as a wholly-owned Subsidiary of Parent.  The Company as the surviving corporation after the Merger is sometimes referred to as the "*Surviving Corporation*".

**2.2**     **Closing**.  The closing of the Merger (the "**_Closing_**") shall take place remotely via the exchange of documents and signatures commencing 9:00 am local time on the second business day following the satisfaction or waiver of all conditions to consummate the Merger (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as Parent and the Company may mutually determine (the "**_Closing Date_**").

**2.3**     **Actions and Deliveries at Closing**.  On the Closing Date, the Parties will cause the Merger to be consummated by filing a Certificate of Merger (or like instrument) with the Secretary of State of Delaware substantially in the form of <u>Exhibit A</u> attached hereto (the "**_Merger Certificate_**"), in accordance with the applicable Corporate Law.  The date and time the Merger becomes effective as specified in the Merger Certificate or as otherwise provided in accordance with the applicable Corporate Law is referred to as the "**_Effective Time_**".  In addition, at the Closing,

(a)     The Company will deliver to Parent:

(i)     The Transaction Documents, duly executed by or on behalf of the Company and the Stockholders, as applicable.

(ii)     The resignation, effective as of the Closing, of the Company's officers and directors.

(iii)     Any Consents to the Merger deemed necessary or convenient by Parent, including (A) the unanimous written Consent of the Company's Board of Directors approving the Merger and recommending that the Stockholders vote in favor of the Merger, and (B) the unanimous written Consent of the Stockholders approving the Merger contemplated herein.

(iv)     All Company Stock Certificates representing outstanding Company Shares and stock option agreements by each Person who has been granted stock options.

(vii)     Other documents as appropriate.

(b)     Parent will deliver to the Company the Transaction Documents, duly executed by or on behalf of the Parent Parties and MPOWER Ventures II, LP, as applicable.

**2.4**     **Effect of the Merger**.  At the Effective Time, the effect of the Merger will be as provided in the applicable Corporate Law.  At the Effective Time, all the Company's and Merger Sub's property, rights, privileges, powers, and franchises will vest in the Surviving Corporation, and all debts, liabilities, and duties of the Company and Merger Sub will become the Surviving Corporation's debts, liabilities, and duties, except for the Note which shall be assumed by Parent pursuant to the Note Assignment.

**2.5**     **Charter and Bylaws**.  At the Effective Time, the Certificate of Incorporation of the Merger Sub will be the Surviving Corporation's Certificate of Incorporation until thereafter amended as provided by Law and such Certificate of Incorporation.  The Merger Sub's bylaws, as

in effect immediately prior to the Effective Time, will be the Surviving Corporation's bylaws until thereafter amended.

**2.6     Directors and Officers**. Merger Sub's directors and officers immediately prior to the Effective Time will be the Surviving Corporation's initial directors and officers.

**2.7     Effect on Capital Stock**. At the Effective Time, because of the Merger and without any action on the part of Parent, Merger Sub, or the Company:

(a)     Common Stock of Merger Sub. Each share of Merger Sub's common stock issued and outstanding immediately prior to the Effective Time will be converted into and exchanged for one validly issued, fully paid, and nonassessable share of the Surviving Corporation's common stock. Each stock certificate of Merger Sub evidencing ownership of any such shares will from and after the Effective Time evidence ownership of shares of the Surviving Corporation's common stock.

(b)     Conversion of Company Shares. Subject to Sections 2.10 and 2.12, each Company Share issued and outstanding immediately prior to the Effective Time will be converted into Parent Shares using the Exchange Ratio (the "**Conversion Consideration**"). All such Company Shares, when so converted, will no longer be outstanding and will automatically be canceled and retired and will cease to exist, and the holder of a certificate (a "**Company Stock Certificate**") that, immediately prior to the Effective Time, represented outstanding Company Shares will cease to have any rights with respect thereto, except the right to receive, upon the surrender of such Company Stock Certificate: (i) the Conversion Consideration, and (ii) certain dividends and other distributions in accordance with Section 2.7(d) (collectively, the "**Merger Consideration**").

(c)     Rights Prior to Surrender, Stock Splits, etc. and Stock Transfer Books. Until surrendered as contemplated by Section 2.8, each Company Stock Certificate will be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the applicable Merger Consideration. If between the date hereof and the Effective Time the outstanding Company Shares or Parent Shares are changed into a different number of shares or a different class because of any stock dividend, subdivision, reclassification, recapitalization, split, combination, or exchange of shares, the Exchange Ratio will be correspondingly adjusted to reflect such stock dividend, subdivision, reclassification, recapitalization, split, combination, or exchange of shares. After the Effective Time, the Company's stock transfer books will be closed and there will be no further transfers of Company Shares prior to the Effective Time. If, at, or after the Effective Time, Company Stock Certificates are presented to the Surviving Corporation, they will be canceled and exchanged in accordance with this Agreement.

(d)     Dividends and Distributions on Merger Consideration. No dividends or other distributions declared or made having a record date after the Effective Time will be paid to the holder of any unsurrendered Company Stock Certificate until the record holder of such Company Stock Certificate has surrendered it under Section 2.8. Subject to the effect of Laws (including escheat and abandoned property Laws), following surrender of any such Company Stock Certificate, there will be paid to the record holder of the certificates representing the applicable Merger Consideration issued in exchange therefor, without interest, (i) the amount of

dividends or other distributions with a record date after the Effective Time that, absent the failure to surrender such Company Stock Certificate, theretofore would have been required to be paid with respect to such Merger Consideration, and (ii) if the payment date for any dividend or distribution payable with respect to such Merger Consideration has not occurred prior to the surrender of such Company Stock Certificate, at the appropriate payment date therefor, the amount of such dividends or other distributions.

**2.8    Surrender of Company Stock Certificates**.

(a)    Exchange Procedures.  As soon as practicable after the Closing, (i) the holders of Company Stock Certificates will surrender such certificates to Parent, (ii) upon surrender of a Company Stock Certificate the holder thereof will be entitled to receive the applicable Merger Consideration, and (iii) the Company Stock Certificates so surrendered will forthwith be canceled.

(b)    Transfers of Ownership.  If any certificate for Parent Shares is to be issued in a name other than that in which the Company Stock Certificate surrendered in exchange therefor is registered, Parent will not be required to issue such Parent Shares until (i) the Company Stock Certificate so surrendered has been properly endorsed and is otherwise in proper form for transfer, and (ii) the Person requesting such exchange has paid to Parent or any agent it designates any transfer or other Taxes required because of the issuance of a certificate for Parent Shares in any name other than that of the registered holder of the Company Stock Certificate surrendered, or established to the satisfaction of Parent or any agent it designates that such Tax has been paid or is not payable.

(c)    No Further Ownership Rights in Company Shares.    All Merger Consideration will be deemed to have been issued in full satisfaction of all rights pertaining to the Company Shares.

(d)    Lost, Stolen, or Destroyed Certificates.  If any Company Stock Certificate has been lost, stolen, or destroyed, Parent will issue the applicable Merger Consideration deliverable in respect thereof upon (i) the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen, or destroyed, and (ii) if the Surviving Corporation requires, the posting by such Person of a bond in such reasonable amount as Parent may direct as indemnity against any claim that may be made against it with respect to such Company Stock Certificate.

**2.9    Cancellation of Company Stock Incentive Plan and Company Options**.  At the Effective Time, automatically and without any action on the part of the holders thereof, the Company will cancel each outstanding Company Option, and the Company's Board of Directors shall terminate the Company's 2010 Stock Incentive Plan.

**2.10    No Fractional Shares**.  No fractional Parent Shares will be issued in the Merger and fractional share interests will not entitle the owner thereof to vote or to any rights of a Parent stockholder.

**2.11    Tax Treatment**.  The Parties intend that the Merger constitute a tax-free reorganization under Code Section 368.

**2.12    Taking of Necessary Action; Further Action**.  If, at any time after the Effective Time, any such further action is necessary or desirable to carry out the purposes of this Agreement and to vest the Surviving Corporation with full right, title and possession to all assets, property, rights, privileges, powers, and franchises of the Company, the officers and directors of the Company, Parent, and Merger Sub are fully authorized in the name of their respective corporations or otherwise to take, and the Company and Parent will cause them to take, all such lawful and necessary action.

**2.13    Stock Certificate Legends**.  Each stock certificate Parent delivers to the Stockholders will be imprinted with legends substantially in the following form:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS.  THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, HYPOTHECATED, OR OTHERWISE ASSIGNED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION, OR EXEMPTION THEREFROM.  THE COMPANY MAY REQUIRE AN OPINION OF COUNSEL (WHICH MAY BE COUNSEL FOR THE COMPANY) IN FORM AND SUBSTANTCE SATISFACTORY TO THE COMPANY TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

Each holder desiring to transfer such shares first must furnish the issuer with (a) a written opinion reasonably satisfactory to the issuer in form and substance from counsel reasonably satisfactory to the issuer under the Securities Act, and (b) a written undertaking executed by the desired transferee reasonably satisfactory to the issuer in form and substance agreeing to be bound by the restrictions on transfer contained herein.

**2.15    Right of Repurchase of Merger Consideration**.  Each Stockholder agrees that Parent shall have the right after the Closing, in connection with an investment in Parent of at least $5,000,000, to repurchase the pro rata shares of the Parent Shares distributed to any  recipient of the Parent Shares in connection with the Transactions that is not an accredited investor (as such term is defined under Regulation D promulgated under the Securities Act) at the time of the closing of such investment (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations, and the like) at the higher of a 25% discount to the then-current fair market value of Parent's then-current series of preferred stock, or the fair market value of Parent Shares, as reflected by Parent's then-current stock option exercise price, unless such stockholder, upon receiving notice from Parent of its desire to effect such a repurchase, is able to represent and warrant that it is an accredited investor.

## ARTICLE III.
## PARENT PARTY REPRESENTATIONS AND WARRANTIES

Each Parent Party represents and warrants to the Company that the statements contained in this ARTICLE III are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and, except as expressly provided in a representation or warranty, as though the Closing Date were substituted for the date of this Agreement throughout this ARTICLE III).

**3.1    Entity Status**. Each Parent Party is an entity duly created, formed, or organized, validly existing and in good standing under the Laws of the jurisdiction of its creation, formation, or organization. Parent has the requisite power and authority to own or lease its properties and to carry on its business as currently conducted. There is no pending or Threatened Action for the dissolution, liquidation, insolvency, or rehabilitation of either Parent Party.

**3.2    Power and Authority; Enforceability**. Each Parent Party has the relevant entity power and authority to execute and deliver each Transaction Document to which it is party, and to perform and consummate the Transactions. Each Parent Party has taken all action necessary to authorize the execution and delivery of each Transaction Document to which it is party, the performance of its obligations thereunder, and the consummation of the Transactions. Each Transaction Document to which a Parent Party is party has been duly authorized, executed, and delivered by, and is Enforceable against, such Parent Party.

**3.3    No Violation**. The execution and delivery of the Transaction Documents to which a Parent Party is party by such Parent Party and the performance and consummation of the Transactions by each Parent Party will not (i) Breach any Law or Order to which such Parent Party is subject or any provision of its Organizational Documents; (ii) Breach any Contract, Order, or Permit to which such Parent Party is a party or by which it is bound or to which any of its assets is subject; (iii) require any Consent, except (A) any SEC and other filings required to be made by either Parent Party, and (B) any notifications or filings to the relevant state or federal regulatory agencies.

**3.4    Brokers' Fees**. No Parent Party has Liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which any Stockholder or the Company could become Liable.

**3.5    Merger Sub**. Merger Sub has been formed for the sole purpose of effecting the Merger and, except as contemplated by this Agreement, Merger Sub has not conducted any business activities and does not have any Liabilities.

**3.6    Capitalization**. Parent's capitalization consists of:

(a)    134,000,000 shares of Common Stock authorized for issuance. Parent holds no treasury stock.

(b)    87,500,000 shares of Preferred Stock, of which (i) 30,338,191 shares have been designated Series C Preferred Stock; (ii) 9,603,797 shares have been designated Series B1 Preferred Stock, (iii) 7,558,012 shares have been designated Series B2 Preferred Stock, and (iv)

40,000,000 shares have been designated Series A Preferred Stock. All of the outstanding shares of Parent's Common Stock, Series A Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock have been duly authorized, are fully paid and nonassessable, and were issued in compliance with all applicable federal and state securities laws. All of the outstanding shares of Parent's Series A Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock are convertible into Parent's Common Stock on a one-to-one basis immediately prior to the Closing Date and the consummation of the transactions contemplated hereunder will not result in any anti-dilution adjustment to the outstanding shares of Parent's Series A Preferred Stock, Series B Preferred Stock, or Series C Preferred Stock. The rights, privileges, and preferences of Parent's Preferred Stock are as stated in Parent's Fourth Amended and Restated Certificate of Incorporation and as provided by the Corporate Law.

(c)     Parent has reserved 20,000,000 shares of Common Stock for issuance to officers, directors, employees, and consultants of Parent pursuant to its 2009 Stock Incentive Plan duly adopted by Parent's Board of Directors and approved by Parent's stockholders.

(d)     The Parent Shares to be issued pursuant to this Agreement will be duly authorized, validly issued, fully paid, and nonassessable and will be issued in compliance with all applicable federal and state securities Laws.

**3.7     Parent Review**.  Parent represents and warrants that:

(a)     It has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Company contemplated hereby, and is able to bear the economic risk of such investment indefinitely.

(b)     It has (i) had the opportunity to meet with representative officers and other representatives of the Company to discuss the Company's business, assets, liabilities, financial condition, cash flow, and operations, and (ii) received all materials, documents, and other information that it deems necessary or advisable to evaluate the Company Shares and the Transactions.

(c)     It has made its own independent examination, investigation, analysis and evaluation of the Company, including Parent's own estimate of the value of the Company Shares.

(d)     It has undertaken such due diligence (including a review of the Company's assets, properties, liabilities, books, records, and contracts) as Parent deems adequate, including that described above.

Nothing in this Section 3.7 will preclude the Parent Parties from relying on the representations, warranties, covenants, and agreements of the Company and the Stockholders herein or from pursuing their remedies with respect to a Breach thereof.

**3.8     Representations Complete**.  Except as and to the extent set forth in this Agreement, no Parent Party makes any representations or warranties whatsoever (INCLUDING, ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) to the Company or Stockholders and each of them hereby disclaims all Liability

and responsibility for any representation, warranty, statement, or information not included herein that was made, communicated, or furnished (orally or in writing) to the Company or any Stockholder or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Company or any Stockholder by any director, officer, employee, agent, consultant, or representative of any Parent Party or Affiliate thereof).

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES
## CONCERNING THE COMPANY

The Company represents and warrants to Parent that the statements contained in this ARTICLE IV are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and, except as expressly provided in a representation or warranty, as though the Closing Date were substituted for the date of this Agreement throughout this ARTICLE IV).

**4.1    Entity Status**.  The Company is an entity duly created, formed, or organized, validly existing, and in good standing under the Laws of the jurisdiction of its creation, formation, or organization.  The Company is duly authorized to conduct its business and is in good standing under the laws of each jurisdiction where such qualification is required.  The Company has the requisite power and authority necessary to own or lease its properties and to carry on its businesses as currently conducted.  The Company is not in Breach of any provision of its Organizational Documents.

**4.2    Power and Authority; Enforceability**.  The Company has the relevant entity power and authority necessary to execute and deliver each Transaction Document to which it is a party and to perform and consummate the Transactions.  The Company has taken all action necessary to authorize the execution and delivery of each Transaction Document to which it is a party, the performance of its obligations thereunder, and the consummation of the Transactions. Each Transaction Document to which the Company is party has been duly authorized, executed, and delivered by, and is Enforceable against, the Company.

**4.3    No Violation**. The execution and the delivery of the applicable Transaction Documents by the Company and the performance of their respective obligations hereunder and thereunder, and consummation of the Transactions by the Company will not (a) Breach any Law or Order to which the Company is subject or any provision of the Organizational Documents of the Company; (b) Breach any Contract, Order, or Permit to which the Company is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Encumbrance upon any of its assets); (c) require any Consent, except any notifications or filings to the relevant state or federal regulatory agencies; (d) trigger any rights of first refusal, preferential purchase, or similar rights; or (e) cause the recognition of gain or loss for Tax purposes with respect to the Company or subject the Company or its assets to any Tax.

**4.4    Brokers' Fees**. The Company does not have any Liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which Parent, Merger Sub, or the Company could become directly or indirectly Liable.

13

**4.5**     **Capitalization; Shares and Stockholder Information**.

(a)     <u>Capitalization</u>. As of the Effective Time, the Company's capitalization consists of:

(i)     15,000,000 shares of Common Stock, of which 7,080,000 shares are issued and outstanding after the Preferred Stock Conversion. The Company holds no treasury stock.

All of the outstanding Company Shares have been duly authorized, are fully paid and nonassessable, and were issued in compliance with all applicable federal and state securities laws. The rights, privileges, and preferences of the Company Shares are as stated in the Company's Amended and Restated Certificate of Incorporation and as provided by the Corporate Law.

(ii)     The Company has reserved 1,700,000 shares of the Company's Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to its 2010 Stock Incentive Plan duly adopted by the Company's Board of Directors and approved by the Company stockholders, of which 372,000 shares are subject to outstanding options. The Company has reserved 200,000 shares of the Company's Common Stock for issuance to certain officers, directors, employees, and consultants of the Company pursuant to those certain Unit Option Agreements, dated as of October 15, 2007, by and between the Company and each of Rimmy Malhotra, Yaron Ben-Zvi, and Todd Smith, respectively. The Company has not made any promises or representations (whether oral or written) regarding equity incentives to any officer, employee, director, advisor or consultant that are inconsistent with the foregoing. None of the Company's stock purchase agreements, stock option agreements, or other arrangement or agreement between the Company and any holder of any equity securities or rights to purchase equity securities contain a provision for acceleration of vesting (or accelerated lapse of a repurchase right) upon the occurrence of any event or combination of events.

(b)     <u>Shares and Stockholder Information</u>. As of the date hereof, to the Company's Knowledge, each Stockholder holds of record and owns beneficially the number of Company Shares as set forth next to such Stockholder's name in <u>Exhibit B</u>, free and clear of any Encumbrances (other than any restrictions under the Securities Act and state securities Laws). Except for that certain Right of First Refusal and Co-Sale Agreement, dated as of December 10, 2010, by and among the Company and certain Stockholders a party thereto, that certain Voting Agreement, dated as of December 10, 2010, by and among the Company and certain Stockholders a party thereto, and that certain Investors' Rights Agreement, dated as of December 10, 2010, by and among the Company and certain Stockholders a party thereto, no Stockholder is a party to any (i) Contract that could require such Stockholder to sell, transfer, or otherwise dispose of any capital stock of the Company (other than this Agreement), or (ii) other Contract with respect to any Equity Interests of the Company.

**4.6**     **Records**. The copies of the Company's Organizational Documents that were provided to Parent are accurate and complete and reflect all amendments made through the date

hereof. The Company's minute books and other records made available to Parent for review were correct and complete as of the date of such review, no further entries have been made through the date of this Agreement, such minute books and records contain the true signatures of the persons purporting to have signed them, and such minute books and records contain an accurate record of all actions of the stockholders, directors, members, managers, or other such representatives of the Company taken by written consent, at a meeting, or otherwise since formation.

**4.7    Company Review**.    Because the Company's Board of Directors and the Stockholders have approved of this Agreement and the Merger and the application of the provisions of the Corporate Law, each Stockholder will be deemed to have agreed that the Company may represent and warrant to the following on behalf of such Stockholder and for the benefit of the Parent Parties. The Company represents and warrants that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the Stockholders' investment in the Parent Shares contemplated hereby, and that the Stockholders are able to bear the economic risk of such investment indefinitely. Nothing in this Sections 4.7 will preclude the Stockholders from relying on the representations, warranties, covenants, and agreements of the Parent Parties herein or from pursuing their remedies with respect to a Breach thereof.

**4.8    Legal Compliance**.    The Company has complied in all material respects with all applicable Laws, and no Action is pending or Threatened against it alleging any failure to so comply. No material expenditures are, or based on applicable Law, will be required of the Company for it and its business and operations to remain in compliance with applicable Law.

**4.9    Title to and Condition of Assets**.    The Company has good, and indefeasible title to, or a valid leasehold interest in, all buildings, machinery, equipment, and other tangible assets (a) located on the Company's premises, and (b) necessary for the conduct of the Company's business as currently conducted, in each case free and clear of all Encumbrances, except for properties and assets disposed of in the Ordinary Course of Business. Each such tangible asset is free from defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition (subject to normal wear and tear), and is suitable for the purposes for which it is currently used.

**4.10    Intellectual Property**.

(a)    The Company owns or has the right to use pursuant to an Enforceable Contract all Intellectual Property necessary to operate the Company's business as currently conducted and as currently proposed to be conducted. Each item of Intellectual Property that the Company owned or used immediately prior to the Closing will be owned or available for use by the Company on identical terms and conditions immediately subsequent to the Closing. The Company has taken all necessary action to maintain and protect each item of Intellectual Property that it owns or uses.

(b)    The Company has not interfered with, infringed upon, misappropriated, or otherwise violated or come into conflict with any other Person's Intellectual Property, and the Company has never received any notice alleging any such interference, infringement, misappropriation, violation, or conflict (including any claim that the Company must license or

refrain from using any other Person's Intellectual Property). To the Company's Knowledge, no third Person has any Intellectual Property that interferes or would be likely to interfere with the Company's use of any of its Intellectual Property. No other Person has interfered with, infringed upon, misappropriated, or otherwise come into conflict with the Company's Intellectual Property.

(c) All former and current employees of the Company have executed written Contracts with the Company that assign to the Company all rights to any inventions, improvements, discoveries or information relating to the Company's business. No employee of the Company has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his or her work to any Person other than the Company.

**4.11 Permits**. The Company possesses all Permits required to be obtained for its businesses and operations. With respect to each such Permit:

(a) It is valid, subsisting and in full force and effect;

(b) There are no violations of such Permit that would result in a termination of such Permit;

(c) The Company has not received notice that such Permit will not be renewed; and

(d) The Transactions will not adversely affect the validity of such Permit or cause a cancellation of or otherwise adversely affect such Permit.

**4.12 Representations Complete**. Except as and to the extent set forth in this Agreement, the Company and Stockholders do not make any representations or warranties whatsoever (INCLUDING, ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) to any Parent Party and each of them hereby disclaims all Liability and responsibility for any representation, warranty, statement, or information not included herein that was made, communicated, or furnished (orally or in writing) to any Parent Party or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to any Parent Party by any director, officer, employee, agent, consultant, or representative of the Company or Stockholder).

## ARTICLE V.
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the earlier of the Closing and the Termination Date that each Party will use its Commercially Reasonable Efforts to take all actions and to do all things necessary to consummate, make effective, and comply with all of the terms of this Agreement and the Transactions applicable to it (including satisfaction, but not waiver, of the Closing conditions for which it is responsible or otherwise in control, as set forth in <u>ARTICLE VI</u>).

## ARTICLE VI.
## CLOSING CONDITIONS

**6.1** **Conditions Precedent to Obligation of the Parent Parties**. The Parent Parties' obligation to effect the Merger and consummate the other Transactions contemplated to occur in connection with the Closing and thereafter is subject to the satisfaction of each condition precedent listed below. Unless expressly waived pursuant to this Agreement, no representation, warranty, covenant, right, or remedy available to a Parent Party in connection with the Transactions will be deemed waived by any of the following actions or inactions by or on behalf of a Parent Party (regardless of whether the Company is given notice of any such matter): (i) consummation by the Parent Parties of the Transactions, (ii) any inspection or investigation, if any, of the Company, (iii) the awareness of any fact or matter acquired (or capable or reasonably capable of being acquired) with respect to the Company, or (iv) any other action, in each case at any time, whether before, on, or after the Closing Date.

(a)     Accuracy of Representations and Warranties.   Each representation and warranty set forth in ARTICLE IV must have been accurate and complete in all material respects as of the date of this Agreement, and must be accurate and complete as of the Closing Date, as if made on the Closing Date.

(b)     Compliance with Obligations.   The Company must have performed and complied with all of its covenants to be performed or complied with at or prior to the Closing (singularly and in the aggregate).

(c)     No Order or Injunction.   There must not be issued and in effect any Order restraining or prohibiting the Transactions.

(d)     No Adverse Litigation.   There must not be pending or Threatened any Action by or before any Governmental Body, arbitrator, or mediator which will seek to restrain, prohibit, invalidate, or collect Damages arising out of the Transactions, or which, in the judgment of Parent, makes it inadvisable to proceed with the Transactions.

(e)     Preferred Stock Conversion.   Prior to the Closing, at the Stockholders' election, each share of the Company's Series A Preferred Stock and the Company's Series B Preferred Stock shall have been converted into such number of validly issued, fully paid, and nonassessable shares of the Company Shares as prescribed in the Company's Amended and Restated Certificate of Incorporation.

(f)     Waivers.   The requisite holders of Parent's Series A Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock shall have waived the notification and preemptive rights granted to such holders as such rights are set forth in that certain Second Amended and Restated Investors' Rights Agreement, dated as of November 28, 2011, by and among Parent and certain stockholders of Parent a party thereto.

(g)     Stockholder Approval.   The Company shall have obtained the written Consent of all Stockholders approving the Merger contemplated herein.

**6.2     Conditions Precedent to Obligation of the Company**.   The Company's obligation to effect the Merger and consummate the other Transactions contemplated to occur in connection with the Closing and thereafter is subject to the satisfaction of each condition precedent listed below.   Unless expressly waived pursuant to this Agreement, no representation, warranty, covenant, right, or remedy available to any Stockholder in connection with the Transactions will be deemed waived by any of the following actions or inactions by or on behalf of any Stockholder or the Company (regardless of whether Parent is given notice of any such matter): (i) consummation by the Company of the Transactions, (ii) any inspection or investigation, if any, of Parent, (iii) the awareness of any fact or matter acquired (or capable or reasonably capable of being acquired) with respect to Parent, or (iv) any other action, in each case at any time, whether before, on, or after the Closing Date.

(a)     <u>Accuracy of Representations and Warranties</u>.   Each representation and warranty set forth in <u>ARTICLE III</u> must have been accurate and complete in all material respects as of the date of this Agreement, and must be accurate and complete as of the Closing Date, as if made on the Closing Date.

(b)     <u>Compliance with Obligations</u>.   Each Parent Party must have performed and complied with all its covenants and obligations required by this Agreement to be performed or complied with at or prior to Closing (singularly and in the aggregate).

(c)     <u>No Order or Injunction</u>.   There must not be issued and in effect any Order restraining or prohibiting the Transactions.

**ARTICLE VII.**
**TERMINATION**

**7.1     Termination of Agreement**.   The Parties may terminate this Agreement as provided below:

(a)     Parent and the Company may terminate this Agreement as to all Parties by mutual written consent at any time prior to the Closing.

(b)     Parent or the Company may terminate this Agreement upon delivery of notice if the Closing has not occurred prior to the Expiration Date; *provided that* the Party delivering such notice will not have caused such failure to close.

(c)     Parent may terminate this Agreement by giving written notice to the Company at any time prior to the Closing if the Company has Breached any representation, warranty, or covenant contained in this Agreement in any material respect (except with respect to materiality for any provisions including the word "material" or words of similar import , in which case such termination rights will arise upon any Breach).

(d)     The Company may terminate this Agreement by giving notice to Parent at any time prior to the Closing if any Parent Party has Breached any representation, warranty, or covenant contained in this Agreement in any material respect (except with respect to materiality for any provisions including the word "material" or words of similar import, in which case such termination rights will arise upon any Breach).

**7.2** **Effect of Termination**. If this Agreement is terminated under <u>Section 7.1</u>, then all further obligations of the Parties under this Agreement will terminate.

**ARTICLE VIII.**
**POST-CLOSING OBLIGATIONS**

**8.1** **General**. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each Party will take such further action (including executing and delivering such further instruments and documents) as any other Party reasonably may request, all at the requesting Party's sole cost and expense.

**8.2** **Confidentiality**. Unless consented to in writing by Parent's Board of Directors, the Company and the Stockholders will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to Parent all tangible embodiments (and all copies) of the Confidential Information which are in the Company's or Stockholder's possession in each case, forever.

**8.3** **Substitution of Options**. As soon as practicable after the Effective Time, Parent will substitute each stock option of the Company outstanding immediately prior to the Effective Time (the "***Company Options***") for an option to purchase that number of Parent Shares as set forth on <u>Exhibit C</u> (the "***Parent Options***"). The Parent Options shall be subject to the terms and conditions of Parent's 2009 Stock Incentive Plan and Parent's standard stock option award agreement. Parent will take all corporate actions necessary to reserve for issuance a sufficient number of Parent Shares for delivery upon exercise of Parent Options Parent substitutes for the Company Options under this <u>Section 8.3</u>.

**8.4** **Employee Matters**. Within 15 days after the Closing Date, Parent shall reimburse the Company's employees for reasonable, necessary, and documented expenses incurred in the performance of their employment obligations in accordance with the Company's reimbursement policy. Within 30 days after the Closing Date, Parent shall pay the Company's outstanding payables set forth on <u>Exhibit E</u> attached hereto.

**ARTICLE IX.**
**MISCELLANEOUS**

**9.1** **Entire Agreement**. This Agreement, together with the Exhibits attached hereto and the certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the Parties in respect of its subject matter and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof or the Transactions. Except as expressly contemplated by <u>ARTICLE VIII</u>, there are no third party beneficiaries having rights under or with respect to this Agreement.

**9.3** **Successors**. All of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the Parties and their respective successors. If a Stockholder is an entity and if the principal business, operations or a majority or substantial portion of the assets of such Stockholder are assigned, conveyed, allocated or otherwise transferred, including by sale, merger, consolidation,

19

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

RÊV WORLDWIDE, INC.

By: _____
Name: Bertrand Sosa
Title: President

GOALMINE MERGER SUB, INC.

By: _____
Name: Roy Sosa
Title: Chief Executive Officer

GOALMINE, INC.

By: _____
Name: Roy Sosa
Title: Authorized Officer

*Signature Page to Merger Agreement*

# STATE OF DELAWARE
## CERTIFICATE OF MERGER OF
### DOMESTIC CORPORATIONS

Pursuant to Title 8, Section 251(c) of the Delaware General Corporation Law, the undersigned corporation executed the following Certificate of Merger:

**FIRST**: The name of the surviving corporation is **Goalmine, Inc.** and the name of the corporation being merged into this surviving corporation is **Goalmine Merger Sub, Inc.**

**SECOND**: The Agreement of Merger has been approved, adopted, certified, executed, and acknowledged by each of the constituent corporations.

**THIRD**: The name of the surviving corporation is **Goalmine, Inc.**, a Delaware corporation.

**FOURTH**: The Certificate of Incorporation of the surviving corporation shall be the Certificate of Incorporation attached hereto as Exhibit A.

**FIFTH**: The merger is to become effective on August 30, 2012.

**SIXTH**: The Agreement of Merger is on file at 601 North Lamar Blvd., Suite 300, Austin, Texas 78703, the place of business of the surviving corporation.

**SEVENTH**: A copy of the Agreement of Merger will be furnished by the surviving corporation on request, without cost, to any stockholder of the constituent corporations.

**IN WITNESS WHEREOF**, said surviving corporation has caused this certificate to be signed by an authorized officer, the 30th day of August 2012.

By: /s/ Roy Sosa
Name: Roy Sosa
Title: Authorized Officer